In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 11-1059, 11-1060, 11-1061,
    11-1068, 11-1069 & 11-1070

HERBERT WHITLOCK and GORDON "RANDY" STEIDL,

*Plaintiffs-Appellees*,

*v.*

CHARLES BRUEGGEMANN, *et al.*,

*Defendants-Appellants*.

Appeals from the United States District Court
for the Central District of Illinois.
Nos. 08-cv-2055 & 05-cv-2127—**Harold A. Baker**, *Judge*.

ARGUED OCTOBER 27, 2011—DECIDED MAY 30, 2012

Before FLAUM, KANNE, and WOOD, *Circuit Judges*.

WOOD, *Circuit Judge*. On July 6, 1986, Karen and Dyke Rhodes were found murdered in their home in Paris, Illinois. They had been stabbed numerous times and their home had been set afire. From the ashes of these gruesome murders rises another, deeply disturbing, allegation: that police and a prosecutor conspired to frame two innocent men of these crimes, and over the

course of the next two decades, state officials continued to cover up those misdeeds.

Herbert Whitlock and Gordon "Randy" Steidl were convicted of the murders in 1987 (Steidl for both deaths and Whitlock for Karen's). They spent the next 21 and 17 years in prison, respectively, before each was finally able to convince a post-conviction court to reverse his conviction on the basis of numerous *Brady* violations. Whitlock and Steidl then brought suit against a variety of state officials for violations of their constitutional rights.

We are familiar with this case from our earlier decision in *Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007), in which we affirmed the denial of a motion to dismiss filed on behalf of some of the defendants. The case then progressed to discovery and most of the defendants moved for summary judgment. With minor exceptions, the district court denied those motions and set a date for trial. We are again asked to evaluate the district court's interlocutory judgment because the defendants raise a variety of immunity defenses.

It has been nearly 25 years since Steidl and Whitlock were convicted of the Rhodes homicides. If their claims are true, a grave and nearly unbelievable miscarriage of justice occurred in Paris, Illinois. Two innocent men will have to deal with its consequences for the rest of their lives. We find no reason to delay their day in court for these matters any further. For the reasons we discuss below, we affirm the district court's denial of each defendant's motion for summary judgment.

**I**

Our earlier opinion summarizes the facts in this case. See *Fermon*, 494 F.3d at 626-27. For convenience and because this appeal involves defendants and a plaintiff (Whitlock) who were not parties to our earlier decision, we briefly review the material facts again here. Wherever we encounter disputed facts we will recount them, as we must, "in the light most favorable [to the plaintiffs]." *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006).

Faced with a sensational and high-profile double homicide, law enforcement officials in Paris, Illinois, quickly responded. That night, Paris police officers Gene Ray and James Parrish, Illinois State Police investigator Jack Eckerty, and State's Attorney Michael McFatridge came together to form an investigative team. In the months and years that followed, they worked closely together on the case.

A local businessman, Robert Morgan, and his associate, Smoke Burba, were early suspects. Morgan owned several local businesses, including a dog food processing company, but Morgan and Burba were also allegedly involved in transporting illegal drugs between Paris and Chicago. Karen Rhodes worked for Morgan at one of his legitimate businesses. Some of her family members and friends told the police that Karen was concerned because she had seen Morgan and Burba loading a machine gun and money into Morgan's truck, and that she was also concerned about large amounts of unexplained cash that were coming through Morgan's business. This

could have provided a motive for Morgan and Burba, or someone associated with them, to kill the Rhodeses. The team interviewed Morgan and several of his employees, but they did not question Burba. For reasons that are unclear, they stopped pursuing this lead.

Their sights instead turned to Steidl and Whitlock. Shortly before the murders, Steidl and Whitlock had met with an FBI agent to complain about illegal gambling in Paris. At that meeting, they named local attorneys who were involved in the gambling ring. Although it is not clear whether they mentioned Michael McFatridge, the State's Attorney, he was allegedly among those involved in the illegal activity. As it happened, the FBI agent in whom Steidl and Whitlock confided knew McFatridge; the two had a close working relationship.

On July 9, 1986, the Paris police purportedly received an anonymous call that Steidl and Whitlock had been making snide comments about the murders. The police brought Steidl and Whitlock into the station and interrogated them. Both denied involvement in the murders and gave alibis, which the police later corroborated. They were released.

Two months later, the case remained unsolved. On September 19, 1986, Ray and Parrish were on patrol when they came across Darrell Herrington, a man widely known in town for his alcohol problems. Herrington also worked for Morgan. Herrington allegedly told the police, "Whatever you do, don't ask me about the murders." Unsurprisingly, the police took him to the stationhouse and interrogated him. Initially, Herrington

told police officers that he was present during the murders and that they had been committed by "Jim and Ed." Ray and Parrish informed Eckerty and McFatridge about this interview the next morning.

The entire investigative team met with Herrington again on September 21. At that meeting, Herrington changed his story entirely and named Whitlock and Steidl as the murderers. The police then put Herrington in seclusion for several days in a hotel. They supplied him with money and alcohol and allegedly fed him additional details about the crimes. Herrington changed his story again, however. During a polygraph, he said that he did not see the murders and did not see Whitlock and Steidl committing them. Police then had Herrington hypnotized. During the hypnosis, Herrington stated that he thought his memory was a drunken nightmare. Once again, the police did not arrest Whitlock or Steidl.

Several months later, in February 1987, Debra Reinbolt contacted her probation officer, who happened to be James Parrish's wife. Reinbolt wanted to get in touch with Parrish because he had previously asked her to serve as an informant in other cases. Reinbolt's story is that over the course of the next several months, Parrish and Eckerty coerced her to implicate Whitlock and Steidl. Led by the police, who knew she had a history of mental illness and drug abuse, she eventually concocted a tale that she was at the murder scene, saw Steidl's car there, and was given the murder weapon by Whitlock when Whitlock left the Rhodeses' house. In response to Parrish's urging, she even turned over a knife

to him, asserting that it was the murder weapon (though it was not). In addition, the police pressured Reinbolt to say that there was a broken lamp in the Rhodeses' bedroom and that Steidl or Whitlock had a piece of the lamp in his hand. This fact is notable because although a broken lamp was found at the scene, and the police knew about its existence, they did not know that later scientific evidence would show that the lamp had been broken after, not before, the fire. After the police secured this account from Reinbolt, they applied for a warrant to arrest Steidl and Whitlock.

Herrington and Reinbolt testified at Steidl's and Whitlock's trials. Their testimony and credibility was the "*sine qua non* of the State's case." *Illinois v. Whitlock*, No. 4-05-0958 (Ill. App. Ct. Sept. 6, 2007). Both were convicted (although as we said, Whitlock was convicted of only Karen's death). Steidl was sentenced to death and Whitlock to life in prison. Years later, both Herrington and Reinbolt gave sworn statements recanting their trial testimony and alleging that the police had told them what to say. McFatridge then drafted affidavits retracting these recantations, and each signed the new statements. In 1996, Reinbolt gave a second, sworn and videotaped recantation. This again was followed by the state's attorney's taping a retraction of her recantation.

In April 2000, additional Illinois State Police (ISP) officers entered the case. ISP Lieutenant Michale Callahan began reviewing the case and concluded that Herrington and Reinbolt's trial testimony was false and that Steidl and

Whitlock were innocent. Callahan detailed this information in several memoranda. As we recounted in our earlier opinion, the ISP defendants began suppressing Callahan's findings. *Fermon*, 494 F.3d at 626-27. During this time, the governor's office was considering pardoning Whitlock and Steidl, and both Whitlock and Steidl had pending post-conviction petitions in state (Whitlock) and federal (Steidl) court.

Steidl's conviction was ultimately vacated on June 17, 2003, when the U.S. district court granted his petition for habeas corpus. The state decided not to reprosecute Steidl because of numerous *Brady* violations that had tainted his trial and the lack of credibility of Herrington and Reinbolt. Steidl was released from prison on May 28, 2004. Whitlock's conviction was not set aside until September 6, 2007, when the Illinois Appellate Court overturned it. The state prepared to retry Whitlock, but ultimately it decided not to proceed. Whitlock was not released from prison until January 8, 2008.

After his release, Steidl filed a Section 1983 suit raising both federal and state law claims. When Whitlock was released, he too filed suit and the two cases were joined. After discovery, the defendants moved for summary judgment. The district court granted only defendant Jeff Marlow's motion for summary judgment on his federal claims; it denied summary judgment for all other claims and defendants. This appeal followed.

**II**

We begin with the appeal of the first group of defendants—Jack Eckerty,[1] James Parrish, and Gene Ray—to whom we refer as the "police defendants." And we start, as we must, with the question of our jurisdiction.

We have jurisdiction to consider the merits of these appeals only "to the extent that [they] turn[] on legal rather than factual questions." *Via v. LaGrand*, 469 F.3d 618, 622 (7th Cir. 2006). That is because our jurisdiction is limited to "final decisions of the district courts." 28 U.S.C. § 1291. Under the collateral-order doctrine, some decisions may be considered "final" and thus immediately appealable even if issued before final judgment. See *Jones v. Clark*, 630 F.3d 677, 679 (7th Cir. 2011) (discussing *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949)). A decision denying a defendant's motion for summary judgment on the ground of qualified or absolute immunity is such a decision. *Mitchell v. Forsyth*, 472 U.S. 511, 528-30 (1985). But "a defendant who appeals from a denial of qualified immunity must limit himself to 'abstract issues of law.'" *Clark*, 630 F.3d at 679 (quoting *Johnson v. Jones*, 515 U.S. 304, 317 (1995)). He "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.*; see also *Hill v.*

---

[1] On the eve of oral arguments, Steidl reached a settlement with Eckerty. Eckerty thus remains in this case only as a defendant in Whitlock's suit.

*Coppleson*, 627 F.3d 601, 605 (7th Cir. 2010) (same for absolute immunity).

Before oral argument in this case, the plaintiffs requested that we dismiss the appeals for lack of jurisdiction, on the ground that the appeals did not raise any purely legal question. We chose not to do so at that time, preferring to consider the factual and legal questions with the benefit of a more complete understanding of the record. Nothing about our earlier decision not to dismiss the appeals is binding; we are always free to reconsider a motions panel's jurisdictional decision. See *United States v. Henderson*, 536 F.3d 776, 778 (7th Cir. 2008) ("Decisions by motions panels do not 'resolve definitively the question of our jurisdiction, and we are free to re-examine' the question when the merits panel hears the case." (quoting *United States v. Lilly*, 206 F.3d 756, 760 (7th Cir. 2000))). We take the opportunity to do so now.

A

The police defendants argue that we have jurisdiction to consider their appeals because they are "not based on the disputed factual record, but rather upon the insufficiency of the district court's ruling that denied them qualified immunity." In their view, the district court failed to identify sufficient evidence in support of its finding that material issues of fact precluded summary judgment. Worse yet, the police defendants argue, the only evidence the court did cite was inadmissible hearsay. See FED. R. CIV. P. 56(c)(2).

No matter how vigorously the police defendants contend that these issues are the sort of abstract legal questions we have jurisdiction to review at this stage of the litigation, they are not. They are merely a "back-door effort to contest the facts." *Clark*, 630 F.3d at 680. The police defendants frame their appeal as a challenge to the sufficiency of the court's explanation but they are essentially arguing that there is no dispute of material fact and that the district court failed to appreciate this (as evidenced by its lack of citation to the record). This is no more than a "sufficiency of the evidence" appeal that we have no jurisdiction to consider. *Leaf v. Shelnutt*, 400 F.3d 1070, 1078 (7th Cir. 2005).

The defendants are correct that the district court's opinion in this case could have been more thorough. We strongly encourage district courts to offer full, reasoned explanations of their decisions, complete with detailed citations to the record. But a district court's failure to do so, though regrettable, does not somehow transform a decision based on disputes of fact into one that contains a reviewable question of law. Our review is *de novo*; even if a district court does not explain its decision at all, we can "affirm summary judgment on any basis we find in the record." *Nature Conservancy v. Wilder Corp. of Delaware*, 656 F.3d 646, 653 (7th Cir. 2011). The Supreme Court has recognized that this might sometimes occur. In *Johnson*, the Court explained that district courts "may simply deny summary judgment motions without indicating their reasons for doing so." 515 U.S. at 319. In those less-than-perfect circumstances, "a court of appeals may have to undertake a cumbersome review

of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Id.*

The brevity of the district court's opinion thus raises no legal question in and of itself that permits us to exercise jurisdiction here. In each of the examples the defendants give of this court's remanding to a district court to reevaluate summary judgment, we did so not because the court's reasoning was insufficient but because the district court had made some legal error and failed to conduct a proper qualified immunity inquiry in the first place. See, *e.g.*, *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906 (7th Cir. 2011) (erroneously believed defendants had waived qualified immunity); *Green v. Carlson*, 826 F.2d 647, 652 (7th Cir. 1987) (applied wrong standard in evaluating claim of qualified immunity); *Whitt v. Smith*, 832 F.2d 451, 453 (7th Cir. 1987) (failed to address qualified immunity claim entirely). Here the court has addressed the qualified immunity question, and the police defendants raise no issue with the court's analysis beyond their contention that the district court did not thoroughly discuss the facts.

Importantly, the district court's opinion touches on the central points. It explicitly refers to several items—notably, the recantations of Reinbolt and Herrington—that, if true (as we must assume at this stage), provide evidence that police officers Eckerty, Parrish, and Ray coerced and manipulated those witnesses to implicate Whitlock and Steidl falsely in the murders.

The police defendants admit that the court considered the recantations, but they urge that we have jurisdiction because there is a legal question whether the recantations were inadmissible hearsay. Questions of admissibility are indeed legal questions; but they are not the sort of legal questions that are sufficiently separable from the merits so as to provide us with jurisdiction in a collateral-order appeal. *McKinney v. Duplain*, 463 F.3d 679, 690 (7th Cir. 2006). In *McKinney*, the defendant presented the same argument that the police defendants offer here: he argued that "the record does not support the district court's conclusion that a genuine issue of fact exists . . . because the only evidence that supports [the plaintiff's claim] comes from the inadmissible opinions of the proffered experts." We were sympathetic to the defendant's position in *McKinney* that the expert opinions there did not meet the admissibility threshold of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). Indeed, we explained that "were we to review the record . . . we would have great difficulty in finding them admissible under *Daubert*." *Id*. But we concluded that "given the mandate of *Johnson*, we lack jurisdiction to conduct such a review of the record." *Id.*; see also *Ellis v. Washington Cnty.*, 198 F.3d 225 (6th Cir. 1999) (holding that there was no jurisdiction under *Johnson* to review whether denial of summary judgment was based on inadmissible hearsay).

B

If we are mistaken about the jurisdictional issue, we add that we see serious problems with the police defen-

dants' position. Although Herrington's and Reinbolt's recantations were both out-of-court statements, it is likely that each would be admissible—Herrington's because his death makes him unavailable, FED. R. EVID. 804(a)(4), and his recantation is a statement that exposes him to perjury charges, FED. R. EVID. 804(b)(3), and Reinbolt's because she is a named defendant in Whitlock's case and thus a party-opponent, FED. R. EVID. 801(d)(2). In both cases, if Reinbolt were called to testify at trial, her sworn recantation would probably be admissible as a prior statement by a witness. FED. R. EVID. 801(d)(1). If her testimony at trial is inconsistent with the recantation, the recantation would be admissible under Rule 801(d)(1)(A). On the other hand, if her testimony at trial is consistent with the recantation, it may still be admissible under Rule 801(d)(1)(B) to rebut a claim that she had recently fabricated the recantation.

Once admitted, Herrington's statement alone precludes summary judgment by supporting plaintiffs' contention that the police defendants violated their right not to have police officers manufacture false evidence. See *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) ("There was and is no disputing that such conduct [including fabricating evidence] violates clearly established constitutional rights."). The police defendants admit that "fabricating, withholding, and suppressing material exculpatory and impeaching evidence is unconstitutional." During the police defendants' first interrogation of Herrington on September 19, 1986, he initially identified "Jim and Ed" as the perpetrators of the murders. The police defendants assert that he changed his mind and

then fingered Whitlock and Steidl during that September 19 interrogation, but Herrington has stated that he did not change his story until a few days later. During that time (and at other times) Herrington said that police defendants gave him alcohol and told him details about the murders that he should include in his testimony: that Steidl possessed a fillet knife; that Herrington knew where the bodies were positioned; and that Karen's face was covered by a pillow. In his sworn recantation, he said that "they told me everything to say" and "ain't none of it true." The police defendants suggest that the fact that State's Attorney McFatridge was aware of this conduct would have discharged their *Brady* obligations. But police must disclose exculpatory evidence to a "competent authority." *Fermon*, 494 F.3d at 630. It is not likely that the police may take shelter behind a prosecutor who is conspiring with them to fabricate false evidence against innocent suspects.

Reinbolt's recantation supplies additional grounds to conclude that the police defendants knew of, and failed to disclose, exculpatory evidence. In her sworn statement she recounted how Parrish coerced her to produce the (false) murder weapon. She reported that he became angry, that he threatened violence, that Parrish and Eckerty badgered her and pressured her to say things that they wanted her to say, and that at times they supplied her with alcohol. Defendant Parrish has admitted that Reinbolt told the police defendants as many as five different stories about the night of the murders before trial, and as many as six after the trial.

ISP investigator Marlow, a defendant in this case, concluded after reviewing the record that Reinbolt's and Herrington's stories were the product of "blatant fabrication" and were "created."

With all of that said, our best judgment is that we lack jurisdiction to consider the police defendants' appeals because none of the issues they raise are legal questions sufficiently separable from the merits. Even if we were to address the merits of their appeal, this limited review of the record shows that there is enough admissible evidence supporting the plaintiffs' claim to create a dispute of material fact.

## III

We next turn to the appeal of Michael McFatridge, the original prosecuting attorney. McFatridge's appeal raises several questions distinct from those raised by the police defendants because, as a prosecutor, McFatridge enjoys absolute immunity for "acts undertaken . . . in the course of his role as an advocate for the State." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

We begin again with the question of our jurisdiction. McFatridge is accused of violating Whitlock's and Steidl's constitutional rights during three different periods: (1) before February 19, 1987, the date when he applied for arrest warrants; (2) between February 19, 1987, and December 31, 1991, the date he stepped down from the State's

Attorney's office;[2] and, (3) the time from his resignation until Whitlock's and Steidl's convictions were reversed.

We can quickly dispose of the second and third periods. The district court held that McFatridge was shielded by absolute immunity during the second period because, once arrest warrants were issued, he was acting as an advocate for the state. *Fields v. Wharrie,* 672 F.3d 505, 510 (7th Cir. 2012); *Coppleson,* 627 F.3d at 605. McFatridge is not complaining about that ruling, and plaintiffs did not file a cross-appeal challenging it; we thus have no jurisdiction to revisit it.

For a different reason, we lack jurisdiction over McFatridge's appeal with respect to the third period: disputes of material fact remain. McFatridge argues that he cannot be held liable under Section 1983 for his actions during this period because he was no longer a state official and thus was not acting under "color of law." Plaintiffs retort that McFatridge was still acting under color of law because he acted in concert with state actors when he made public statements during their post-conviction and clemency proceedings that continued to violate their constitutional rights.[3] Everything here depends on McFatridge's interactions with others,

---

[2]  The district court's opinion refers to this date as December 31, 2001. This must be a typo, as the record reflects that the actual date was December 31, 1991.

[3]  We note that this is quite different from the situation we faced in *Fields v. Wharrie,* 672 F.3d 505 (7th Cir. 2012), where the prosecutors remained in office but had differing degrees of responsibility for that particular case.

and those facts are disputed. We have no jurisdiction to consider this factual dispute on an interlocutory appeal. We note, however, that in order to hold McFatridge liable for his post-resignation conduct under 42 U.S.C. § 1983, plaintiffs will eventually have to show that McFatridge acted under "color of law," by "jointly engag[ing] with state officials in the prohibited action." *Adickes v. Kress*, 398 U.S. 144, 152 (1970). This is a high standard. "[T]here must be evidence of a concerted effort between a state actor and [a private] individual." *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998) (emphasis in original); see also *Filarsky v. Delia,* 132 S. Ct. 1657 (2012) (holding that a private attorney retained by a city to investigate wrongdoing is entitled to assert qualified immunity). They would also need to address one of the points that was critical in *Fields*: how to surmount the burden of showing that the original prosecutor somehow ceased to function in that capacity after he was officially removed from the case. Now is not the time to address those issues in our case; we merely flag them for the future.

This brings us to the heart of McFatridge's appeal: whether at this time he is entitled to prevail on his claim of absolute or qualified immunity for his conduct during the first period, before the arrest warrant issued. He has asserted that he is entitled to absolute immunity based on *Imbler v. Patchman*, 424 U.S. 409 (1976), or in the alternative, that he is entitled to qualified immunity because he did not violate any of the plaintiffs' clearly established constitutional rights. See *Harlow v. Fitzgerald,* 457 U.S. 800 (1982); *Pearson v. Callahan,* 555 U.S. 223 (2009). McFatridge

cannot prevail on either of these theories, as we now explain.

### A. *Absolute Immunity*

The district court rejected McFatridge's assertion of absolute immunity because, in its view, the record contained "evidence about McFatridge's involvement with the police during the investigation phase of the cases that could support the conclusion that he was acting in an investigative mode." Specifically, the district court held that "manufacturing [false evidence] and directing the police officers . . . in their treatment and pursuit of the witnesses Herrington and Reinbolt; and directing the police to abandon any inquiry about other suspects" were actions taken in an investigative capacity. Thus, using the functional test of *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), it concluded that McFatridge was protected by only qualified, not absolute, immunity.

McFatridge argues that this holding lacks adequate factual foundation: he says that the court erred by "focus[ing] on Plaintiffs [*sic*] theories and accusations of wrongdoing which lack factual support." He urges that if the court had considered only admissible facts and allegations supported by the record, it would have realized that McFatridge "never engaged in any investigative activities" and thus was entitled to absolute immunity.

These arguments take issue solely with the district court's analysis of the facts, not with its application of

the law. This interlocutory appeal is therefore not the proper place for McFatridge to challenge those decisions. We recently addressed a similar situation in *Hill v. Coppleson*, 627 F.3d 601 (7th Cir. 2010). In *Hill*, the "question of whether [the prosecutor] was acting in the role of an advocate or an investigator depend[ed] in part on whether probable cause for [the plaintiff's] arrest existed." *Id.* at 605; see also *Buckley*, 509 U.S. at 274 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."). Here too, "the probable cause question turns on a disputed issue of fact." 627 F.3d at 605. On February 19, 1987, when McFatridge submitted arrest warrants for Whitlock and Steidl, a judge determined that probable cause existed to support their arrests. As we have already said, the correctness of the district court's decision that from that point on McFatridge was protected by absolute prosecutorial immunity is not properly before us. McFatridge tries to argue that he was protected by immunity *before* that point, too, because he believes that Herrington's interview supplied probable cause much earlier. But that fact is hotly disputed. There is evidence in the record that the police did not believe that Herrington's interview provided probable cause, given Herrington's compromised credibility. This view of the likely assessment by the police is corroborated by the fact that they did not attempt to arrest Whitlock and Steidl immediately after obtaining Herrington's initial statements; it was not until Reinbolt's statement that they sought an arrest warrant.

McFatridge argues that even if probable cause did not arise until February 19, we should find that his actions during the pre-arrest warrant phase were not investigative. He contends that he was merely overseeing the investigation to try to build a case for a future trial. But the Supreme Court has eschewed bright-line rules based solely on the status or job description of the prosecutor. It has instead said that "[a] prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial." *Buckley*, 509 U.S. at 276. We made a similar observation in *Fields*, when we said that "absolute immunity doctrine focuses on whether the nature of the action is prosecutorial, not on the fact that the actor is a prosecutor." 672 F.3d at 514.

The fact that McFatridge eventually proceeded with this prosecution does not wipe away his involvement in the investigation at its earliest stages. He went to the scene of the crime and the hospital shortly after the murders, long before probable cause supported any arrests or anyone had sought his advice as a lawyer. Under the functional line the Supreme Court drew in *Buckley*, a prosecutor does not enjoy absolute immunity before he has probable cause. 509 U.S. at 274; see *Fields*, 672 F.3d at 512 ("Prosecutors do not function as advocates before probable cause to arrest a suspect exists."). We

readily concede that the question whether a prosecutor always has absolute immunity for conduct taken after he has probable cause is murkier, see *Buckley*, 509 U.S. at 281 (Scalia, J., concurring), but we need not address that issue here. Plaintiffs have not appealed the district court's holding that McFatridge had absolute immunity for all post-probable cause conduct, and so we have nothing to say about it.

In the end, we conclude just as we did in *Hill* that we cannot resolve the absolute immunity question for McFatridge's conduct during the first period without resolving the factual dispute over the moment when probable cause developed. If McFatridge took no action related to the investigation before that point and became involved only after he had put on his prosecutorial hat, then he will be entitled to absolute immunity. If, on the other hand, plaintiffs can prove that he fabricated evidence before probable cause arose, then absolute immunity is off the table. We conclude that we have no jurisdiction over this aspect of the appeal.

Before moving on to the issue of qualified immunity, we pause to explain why we believe that nothing in what we have said about absolute immunity conflicts with our recent decision in *Fields*. The underlying facts in *Fields* were similar to those before us, but the procedural setting differed considerably. There, plaintiff Nathan Fields had been convicted of two murders in 1986; some 25 years later, he was exonerated, and he sued two assistant state's attorneys (among others) for damages on the theory that they "induced false testi-

mony during his trial and subsequent retrial, suppressed the compromised nature of this testimony and its acquisition from him, and denied him due process." 672 F.3d at 508. The appeal reached our court from the district court's decision to deny absolute immunity to the two prosecutors. We reversed, with the following findings:

> (1) . . . [Assistant State's Attorney] Wharrie is entitled to absolute immunity for his alleged solicitation of false testimony from Earl Hawkins after Fields' original trial, as well as for his alleged suppression of its falsity; and (2) . . . Fields failed to state a claim against [Assistant State's Attorney] Kelley with respect to his alleged coercing Randy Langston's testimony.

*Id.*

Context matters in these cases, as *Fields* acknowledged, 672 F.3d at 512, and the most conspicuous difference between our case and the one in *Fields* is the alleged role played by the prosecutor. Fields argued that Wharrie suppressed the fact that he asked Hawkins to lie *after* Fields was already convicted, in the event of a potential retrial. If true, that would be reprehensible, but the law is clear that absolute immunity applies to a prosecutor's decisions about evidence and her implementation of her *Brady* responsibilities. It was in that setting that we remarked that *Brady* and *Giglio* obligations are functionally prosecutorial. *Id.* at 512. We did not say, nor did we mean, that *Brady* and *Giglio* exhaust the possible issues that might arise under the due process clause. Where a litigant presents a due process claim—*Brady*,

*Giglio*, or otherwise—the question of immunity turns on the capacity or function that the prosecutor was performing at the time of the alleged wrongful conduct. That is why we noted more recently in *Lewis v. Mills*, No. 11-2012, 2012 WL 1372110 (7th Cir. April 20, 2012), that "a showing that a prosecutor *investigated* and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity, even if that target was later brought to trial." *Id.* at *5 (emphasis added). In short, because the record in *Fields* indicates that the two prosecutors there had undertook all of the challenged acts while acting in a prosecutorial role, this court reversed the district court's decision denying immunity. The focus of our case, as we have narrowed it, is exclusively on the period before probable cause supported the prosecution, when a prosecutor is unquestionably acting in an investigative role. Because there are factual issues that must be resolved before we can pinpoint that moment, it is not suitable for resolution at this time.

### B. *Qualified Immunity*

The absolute immunity inquiry is not all that McFatridge is presenting; he also challenges the district court's decision refusing to find that he has qualified immunity from suit. An official is entitled to qualified immunity for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818. The Supreme Court has held that two central

questions must be addressed in the course of determining whether qualified immunity is available: whether the plaintiff has alleged a deprivation of a constitutional right at all, and whether the right at issue was clearly established at the time and under the circumstances presented. See *Pearson,* 555 U.S. at 232. Courts may take up those questions in whatever order seems best for the case at hand.

As the Supreme Court suggested in *Saucier v. Katz,* 553 U.S. 194 (2001), we will take up first the question whether the plaintiffs have identified a violation of their constitutional rights, and we will then consider whether the law was clearly established such that any reasonable person should have known what was required.

i

We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way. In *Jones v. City of Chicago*, we upheld a jury's imposition of damages against a variety of defendants, including police officers and a crime lab technician, who "were determined to put away George Jones regardless of the evidence." 856 F.2d 985, 993 (7th Cir. 1988). We have since said that there "is no disputing that such conduct [fabricating evidence] violates clearly established constitutional rights." *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008). Indeed, in this very case, the police defendants admit that the allegations that they

fabricated evidence—the same allegations as those against McFatridge—state a due process claim.

The only question is whether a prosecutor who is acting in an investigatory capacity is subject to rules that are any different. We think not. A prosecutor who manufactures evidence when acting in an investigatory role can cause a due process violation just as easily as a police officer. The fact that the prosecutor who introduces the evidence at trial cannot be liable for the act of introduction, whether it is the same prosecutor who fabricated the evidence or a different prosecutor, is beside the point. It would be "incongruous," *Burns v. Reed*, 500 U.S. 478, 495 (1991), to hold a police officer liable for fabricating evidence but hold that the prosecutor has not committed any violation for taking the same action in the same capacity.[4]

In fact, the whole point of the Supreme Court's rule in *Buckley* is that the police and investigating prosecutors are subject to the same constraints. McFatridge pushes back against that conclusion primarily by arguing that

---

[4] Our comment in *Fields* that there might be a distinction between the liability of a police officer who fabricates evidence and that of a prosecutor who fabricates or suppresses evidence must once again be understood against the backdrop of the facts there. See 672 F.3d at 514. Once the prosecutor ceases his investigatory work and acts in a prosecutorial capacity, he is entitled to absolute immunity even if the police officers who are working side by side with him may invoke only qualified immunity.

the allegations against him fall short because of his *later* prosecutorial role. He cites this court's decision in *Buckley v. Fitzsimmons*, 20 F.3d 789 (7th Cir. 1994) (*Buckley IV*), for the proposition that even if he had participated in the coercion of witnesses Herrington and Reinbolt, that action alone did not violate Whitlock's and Steidl's rights. Their rights were not violated, he contends, until the perjured testimony was introduced at trial. McFatridge enjoys absolute immunity for anything that happened at trial, of course. We thus focus exclusively on the legal question whether coercing witnesses to perjure themselves during the investigatory phase of a case can give rise to an actionable due process violation against a prosecutor.

In *Buckley*, the Supreme Court assumed that the answer to that question is yes in order to hold that prosecutors have the same immunity as police officers for such conduct. See 509 U.S. at 274 n.5. The Court was poised to address this question more directly in *McGhee v. Pottawatamie Cnty.*, 547 F.3d 922 (8th Cir. 2008), *cert. granted*, 129 S. Ct. 2002 (2009), in which the Eighth Circuit squarely held that this conduct violates due process. But the parties settled after oral argument and the Court dismissed the case without an opinion. See 130 S. Ct. 1047 (2010). We thus focus on earlier Supreme Court case law addressing a prosecutor's creation and use of perjured testimony.

In *Mooney v. Holohan*, 294 U.S. 103 (1935), *Pyle v. Kansas*, 317 U.S. 213 (1942), and *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court held that a prosecutor

violates due process when she knowingly uses perjured testimony to secure a conviction. The question before us is whether that principle also covers the predicate step of creating the false testimony. In *Napue*, the Court condemned something even more innocuous—a prosecutor's failure to correct a witness—while pointing out that it was not as bad as affirmatively "soliciting false evidence." 360 U.S. at 269. It is hard to see how the more egregious step of crafting false evidence is any less of a violation. That creation, whether by police officers or by a prosecutor acting in an investigatory capacity, would not happen unless the investigatory personnel intended to serve it up to the prosecutor for use at trial—which, we note, is exactly what happened here. As the First Circuit has put it, "if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction)." *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004).

McFatridge's error is to assume that because a prosecutor acting in a prosecutorial capacity cannot be liable for the act of introducing perjured testimony (because of the protection of absolute immunity), he cannot be liable while acting in an investigatory capacity for creating false testimony. The only wrong, he argues, is the one that occurred at trial and thus any fabrication in which he participated is beyond the reach of the law.

This argument ignores the lessons of *Mooney* and *Napue.* McFatridge is correct that the alleged constitutional violation here was not complete until trial. That is because a violation of the Fourteenth Amendment does not occur unless a person is "deprive[d] . . . of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. As we explained in *Buckley IV*, if an officer (or investigating prosecutor) fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest. 20 F.3d at 795; see also *id.* at 796 ("Just as there is no common law tort without injury, there is no constitutional tort without injury."). In other words, in such a case the plaintiff could not establish one of the necessary elements of a constitutional tort: that the officer's act (fabrication) caused any injury. See *McCree v. Grissom*, 657 F.3d 623, 624 (7th Cir. 2011) (dismissing Section 1983 suit for failure to state a claim where plaintiff "did not allege an injury") (per curiam). This principle is universally recognized among circuits that have considered this question. See, *e.g., Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) ("The manufacture of false evidence, 'in and of itself,' . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right."); *Landrigan v. City of Warwick*, 628 F.2d 736, 744 (1st Cir. 1980) ("For purposes of recovering damages at least, we do not see how the existence of a false police report, sitting in a drawer in a police station, by itself deprives a person of a right secured by the Constitution and laws."); see also *Buckley*, 509 U.S. at 281

(Scalia, J., concurring) ("I am aware of no authority for the proposition that the mere preparation of false evidence, as opposed to its use in a fashion that deprives someone of a fair trial or otherwise harms him, violates the Constitution.").

Here, the plaintiffs have properly alleged that the act of fabrication caused a harm to them: the fabricated evidence, because it was introduced against them at trial, was instrumental in their convictions. Section 1983 imposes liability on every official who "subjects, *or causes to be subjected*, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added). This provision must be "read against the background of tort liability." *Monroe v. Pape*, 365 U.S. 167, 187 (1961). Causation is a standard element of tort liability, and includes two requirements: (1) the act must be the "cause-in-fact" of the injury, *i.e.*, "the injury would not have occurred absent the conduct"; and (2) the act must be the "proximate cause," sometimes referred to as the "legal cause," of the injury, *i.e.*, "the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 640 n.1 (7th Cir. 2008) (citing 1 DAN B. DOBBS, THE LAW OF TORTS § 182 (2001)). This is the sense in which the "location of the injury" is relevant to "whether a complaint has adequately alleged a cause of action for damages." *Buckley*, 509 U.S. at 272. Causation requires us to analyze the relation between an official's conduct and a resulting injury; when, where, and exactly

how that injury occurs is part of the proximate cause question. *Cf. Martinez v. California*, 444 U.S. 277, 285 (1980) (injury that resulted from parolee's killing was "too remote" from state parole board's decision to release the parolee to hold the board liable for the death).

The actions of an official who fabricates evidence that later is used to deprive someone of liberty can be both a but-for and proximate cause of the due process violation. Without the fabrication, the prosecuting attorney would have had no tainted evidence to introduce at trial. And in a trial where the fabricated evidence is the crux of the case (as Whitlock and Steidl allege is the case here), a plaintiff could show that the fabrication was a but-for cause of his conviction.

We have found fabrication to be a proximate cause of the violation in comparable cases. This is why we hold police officers who fabricate evidence liable for the liberty deprivation that occurs later when the fabrication is used. *Jones*, 856 F.2d at 994 (calling the police officer's role "instrumental" in causing the violation). In *Jones* we explained that "[i]n constitutional-tort cases as in other cases, 'a man [is] responsible for the natural consequences of his actions.'" 856 F.2d at 993 (quoting *Monroe*, 365 U.S. at 187). A prosecutor's decision to introduce the bad evidence at trial may be a second proximate cause, albeit one beyond the reach of the law if absolute immunity applies because the prosecutor is acting in a prosecutorial function. But even though a prosecutor's immunized decision may be closer in time to the deprivation of liberty than the officer's

earlier decision to fabricate, there is no rule demanding that every case have only one proximate cause. To the contrary, "multiple proximate causes are often present" and "an actor's tortious conduct need not be close in space or time to the plaintiff's harm to be a proximate cause." REST. 3D TORTS § 29 cmt. b. Thus it does not matter that other acts are also proximate causes of the ultimate violation, or that some of those acts may be taken by an actor who is absolutely immune.

That a prosecutor has absolute immunity for conduct taken in his advocacy role is beside the point for this purpose: "there is no common-law tradition of immunity for [investigatory conduct], whether performed by a police officer or prosecutor." *Buckley*, 509 U.S. at 274 n.5. Thus, a prosecutor whose investigatory conduct is the proximate cause of the due process violation that occurs when the false evidence is introduced at trial is held to the same standard of liability as a police officer who does the same thing. See *Buckley IV*, 20 F.3d at 797 n.2 (explaining that a prosecutor acting in an investigatory capacity and thus not absolutely immune could be liable just like a police officer, "under the rationale of *Jones*").

The causal link between a police officer's fabrication and the victim's injury may be broken if that police officer tells a prosecuting attorney before trial about the fabrication. We noted in *Buckley IV* that the officers in *Jones* would not have been liable "if the prosecutors had known the truth and proceeded anyway" because "then the immunized prosecutorial decisions would be the

cause of the injury." 20 F.3d at 797; see also *Newsom v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) (explaining the converse: "If officers are not candid with prosecutors, then the prosecutors' decisions—although vital to the causal chain in a but-for sense—are not the important locus of action."). In the hypothetical scenario from *Jones*, causal responsibility for the violation lies with the prosecutor who chooses to put on the fabricated evidence, not with the fabrication itself, because "[i]f the prosecutors had known" of the fabrication they could (and should) "have dropped the charges." *Jones*, 856 F.2d at 993.

Another way of describing this break in the causal chain is that a prosecutor's action in putting evidence on, known to be fabricated, may in some circumstances be a superseding or supervening cause of the violation. See REST. 3D TORTS § 34; *cf. Malley v. Briggs*, 475 U.S. 335, 345 (1986) (judge's decision to issue an arrest warrant does not break causal chain of police officer's liability for submitting an affidavit without probable cause); see also *Dominguez*, 545 F.3d at 589-90 (discussing proximate and supervening causes). This formulation does not help McFatridge, however, because in his case there is no supervening cause that breaks the chain from his fabrication as an investigator to the constitutional viola-tion. McFatridge was one of the officials who allegedly fabricated evidence. One's own conduct cannot be an intervening cause sufficient to defeat a finding of causa-tion. "A superseding cause is something culpable that intervenes . . . , some action of a *third party* that makes the plaintiff's injury an unforeseeable consequence of the

defendant's negligence." *Scottsdale Ins. Co. v. Subscription Plus, Inc.*, 299 F.3d 618, 621 (7th Cir. 2002) (emphasis added); see also *Zahrey*, 221 F.3d at 353; *Gregory v. City of Louisville,* 444 F.3d 735, 739 (6th Cir. 2006); *Thomas v. Sams*, 734 F.2d 185 (5th Cir. 1984); *Michaels v. McGrath*, 531 U.S. 1118, 1119 (2001) (Thomas, J., dissenting from denial of *certiorari*) (supporting the Second Circuit's approach in *Zahrey* that the "intervention of a subsequent immunized act by the same officer does not break the chain of causation necessary for liability").

It is true that *Buckley IV* also dealt with a claim against a prosecutor who collected evidence as an investigator and then went on to use that evidence at trial, and we did not permit that claim to go forward. But the alleged constitutional violations in *Buckley IV* were different from those here and thus do not control our analysis. Here the plaintiffs allege that the investigator-prosecutor fabricated evidence, and from a common-sense standpoint, the only reasonable explanation for this act was to make that evidence available for use in later proceedings. The plaintiff in *Buckley IV*, in contrast, sought to hold prosecutors liable for "repeatedly interrogat[ing]" two witnesses and "pa[ying] them for statements inculpating [the plaintiff]," 20 F.3d at 794, as well as for "seeking out and hiring a witness," *i.e.*, witness-shopping for favorable expert testimony, *id*. at 797. Coercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but they do not necessarily add up to a constitutional violation even when their fruits are introduced at

trial. Evidence collected with these kinds of suspect techniques, unlike falsified evidence and perjured testimony, may turn out to be true. See, *e.g.*, *Kunik v. Racine Cnty.*, 106 F.3d 168 (7th Cir. 1997) (granting qualified immunity to police defendants who obtained confession using coercive tactics because "such confessions might nonetheless be considered 'voluntary' as a matter of law, and arrests are based on them every day"); see also *Wallace v. City of Chicago*, 440 F.3d 421, 429 (7th Cir. 2006) (rejecting that there is a "free-standing due process claim whenever unfair interrogation tactics . . . are used to obtain a confession"); *Devereaux v. Abbey*, 263 F.3d 1070, 1077-78 (9th Cir. 2001) (*en banc*) (holding that questionable investigative techniques did not cause due process violations and noting that "[f]ailing to follow guidelines or to carry out an investigation in a manner that will ensure an error-free result is one thing; intentionally fabricating false evidence is quite another"); *Michaels v. New Jersey*, 222 F.3d 118, 120 (3d Cir. 2000) (dismissing Section 1983 claim against officials who used questionable techniques to interview children regarding alleged sex abuse). In this latter group of cases, any resulting due process violation that occurs when the evidence is introduced at trial cannot be traced back as far as its creation. We recognized as much in *Buckley IV*; we explained that it was possible that the use of "the [coerced] confession could violate Buckley's rights" when admitted at trial, if it were actually false or unreliable. Nevertheless, we held that any claim about that injury would be barred by absolute immunity "[b]ecause the 'reliability' aspect of coerced-confession law is an element of trial practice." 20 F.3d at 795; see

also *id.* at 797 ("These wrongs, if they are wrongs at all, occurred at trial.").

We conclude, in summary, that the plaintiffs have asserted claims that, if proven, would demonstrate a violation of their constitutional rights, and thus they have satisfied the first step of *Saucier* and *Pearson.*

ii

We turn therefore to the second issue, which is the one on which the district court focused: whether the "right to due process that the plaintiffs claim" was clearly established before February 19, 1987, the date of their conviction. The court quoted *Mooney* to show that as early as 1935 it was clearly established that a state's "presentation of testimony known to be perjured . . . to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." 294 U.S. 103, 112-13 (1935). The court noted that "McFatridge, as a State's Attorney, must be held to have known such a basic concept."

The district court did not define this "basic concept." Perhaps this is because the idea that an investigating prosecutor (or any other state actor) should know not to fabricate evidence in order to frame a suspect is so elementary that the court felt that it needed no further explanation. In order for us to evaluate whether the right that plaintiffs identified was clearly established, however, "it is important to determine the precise

claim" at issue. *Burns*, 500 U.S. at 487. *Mooney* is not directly on point; it concerned a due process violation that occurred at trial (the introduction of perjured testimony), as opposed to the rather different question whether an official's creation of false evidence while an investigation is ongoing violates due process. As we just explained, we believe that the clear implication of *Mooney* and its progeny is that a prosecutor's creation of false evidence also violates due process, so long as a plaintiff can show the fabrication actually injured her in some way (and can get beyond absolute immunity).

Significantly, all courts that have directly confronted the question before us agree that the deliberate manufacture of false evidence contravenes the Due Process Clause. *E.g.*, *Devereaux*, 263 F.3d at 1074-75 (recognizing a "due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government" and noting that because this "proposition is virtually self evident, we are not aware of any prior cases that have expressly recognized this specific right"); *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) ("We therefore hold that the deliberate or knowing creation of a misleading and scientifically inaccurate serology report amounts to a violation of a defendant's due process rights, and that a reasonable laboratory technician in 1984 would have understood that those actions violated those rights."). McFatridge points to no contrary authority. It is of no moment that the Supreme Court has never expressly held that this conduct violates the Constitution; it is enough that officials have "fair and clear warning" that

their conduct is prohibited under earlier precedents. *United States v. Lanier*, 520 U.S. 259, 271 (1997); see also *Devereaux*, 263 F.3d at 1075 ("[A] right can be clearly established on the basis of common sense." (quoting *Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001)); *Burgess v. Lowery,* 201 F.3d 942, 944-45 (7th Cir. 2000); *Anderson v. Romero,* 72 F.3d 518, 526-27 (7th Cir. 1995). Plaintiffs have described just such a clearly established right here, and thus the district court properly refused to grant qualified immunity to McFatridge for any acts he undertook while acting in his investigatory capacity.

iii

Our decision to deny qualified immunity under the unusual circumstances presented by this case should not deter prosecutors from engaging in legitimate investigatory work. Qualified immunity remains an important shield that protects "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341. Furthermore, the plaintiff bears the burden of alleging in the complaint "enough factual matter" to supply "plausible grounds" to infer that absolute immunity has not yet attached, that the prosecutor knowingly fabricated evidence, that the evidence was later used against the plaintiff at her criminal trial, and that it was material enough to have caused a wrongful conviction. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In addition, courts "presume that public officials have properly discharged their official duties." *Banks v. Dretke*,

540 U.S. 668, 696 (2004); see also *United States v. Pittman*, 642 F.3d 583, 587-88 (7th Cir. 2011). It will be exceedingly rare (we hope) that a plaintiff will be presenting anything like the serious and disturbing allegations Whitlock and Steidl raise in this case. Finally, and in some ways most importantly, these claims cannot be brought at all unless and until a criminal defendant is able to secure a dismissal or reversal of his criminal conviction. See *Dominguez*, 545 F.3d at 588 ("A § 1983 claim for a due process violation based on the denial of a fair criminal trial may be brought only after the conviction is set aside."). Winning a challenge to a criminal conviction on direct appeal or through a collateral attack is no easy task. Given these high barriers, we are convinced that the prospect of suit will not "cause a deflection of the prosecutor's energies from his public duties." *Imbler*, 424 U.S. at 423.

Before closing this part of our discussion, we emphasize that we have dealt with the facts in the light most favorable to the opponents of summary judgment— Whitlock and Steidl. McFatridge is free to argue, and a jury free to decide, that he did not do the things that Whitlock and Steidl allege. He may also argue that even if he did fabricate evidence, the plaintiffs cannot establish causation. He may try to convince a jury that the plaintiffs would have been convicted regardless of the fabricated evidence. See, *e.g.*, *Jones*, 856 F.2d at 993. All we decide on this interlocutory appeal is that he is not entitled to have the entire case set aside on immunity grounds, either absolute or qualified.

This decision also controls the disposition of McFatridge's challenges to plaintiffs' state claims. In Illinois, immunity is either the same as, or harder to obtain, than it is in a federal court. See *White v. City of Chicago*, 369 Ill. App. 3d 765 (Ill. App. Ct. 2006). Because McFatridge is not protected by immunity on the federal claims we have identified, he is not protected by immunity on the comparable state claims.

## IV

We finally reach the appeals of our last group of defendants: Illinois State Police officials Charles E. Brueggemann, Diane Carper, Steven M. Fermon, Kenneth Kaupas, Andre Parker, and Jeffrey Marlow (we will refer to this group as the "ISP defendants"). The ISP defendants have settled with Steidl, but they remain in the case as defendants in Whitlock's case. Our discussion in this section thus focuses exclusively on Whitlock. In addition, the district court granted summary judgment on Marlow's federal claims. He remains in the suit as a defendant on only the state law claims. The ISP defendants contest the district court's decision that they are not entitled to qualified immunity. We have jurisdiction over those questions and address each in turn. Like the police defendants, they challenge the district court's evaluation of disputes of material fact. That means that these appeals are not properly before us.

A

Focusing on the first inquiry for qualified immunity purposes—whether a constitutional right was allegedly violated—the ISP defendants begin with a challenge to this court's earlier holding in *Steidl v. Fermon* that "the *Brady* line of cases has clearly established a defendant's right to be informed about exculpatory evidence throughout the proceedings, including appeals and authorized post-conviction procedures, when that exculpatory evidence was known to the state at the time of the original trial." 494 F.3d at 625. Not only do they take issue with our earlier decision that such a right was clearly established; they go further and argue that no such right exists in the first place. They believe this result is required by *Osborne v. District Attorney's Office for the Third Judicial District*, in which the Supreme Court rejected the proposition that the "Due Process Clause requires that certain familiar preconviction trial rights [like *Brady*] be extended to protect [a defendant's] postconviction liberty interest." 129 S. Ct. 2308, 2319 (2009).

The district court correctly rejected this argument: the ISP defendants read *Osborne* too broadly. *Osborne* rejected a claim that Alaska's procedures governing the access of defendants to post-conviction DNA testing violated due process. Critically, the evidence that Osborne sought was not exculpatory evidence that had been in existence at the time of his original trial. Instead, he was seeking the opportunity to collect and submit entirely new, and he hoped exculpatory, evidence. The Court rejected the argument that *Brady* required the state to allow the defen-

dant access to these new tests because the defendant had already been "proved guilty after a fair trial." 129 S. Ct. at 2320. But *Brady* continues to apply to an assertion that one did not receive a fair trial because of the concealment of exculpatory evidence known and in existence at the time of that trial. We explicitly recognized this distinction in our earlier opinion. See *Fermon*, 494 F.3d at 629 ("We . . . have no need here to decide whether disclosure of exculpatory evidence discovered post-trial is required under *Brady*; this case presents only the same question as the Court addressed in *Brady*, namely, whether exculpatory evidence discovered before or during trial must be disclosed during post-conviction proceedings.").

The ISP defendants cite only two cases in support of their argument that *Osborne* has worked a significant change in *Brady* doctrine, but neither is precedential and both dealt with evidence that did not exist at the time of the original trial. See *Galatolo v. United States*, 394 F. App'x 670, 672-73 (11th Cir. 2010); *Barnes v. Hennepin Co. Dist. Atty's Office*, 364 F. App'x 301, 302 (8th Cir. 2010).

The ISP defendants also contend that Whitlock and Steidl have no right to exculpatory evidence at post-conviction or clemency proceedings, but they misunderstand the *Brady* right. It is a trial right; the reason there is a continuing obligation on the state to disclose evidence is not because of some special right associated with post-conviction or clemency but because "the taint on the trial that took place continues throughout the proceedings, and thus the duty to disclose and allow correction of that taint continues." *Fermon*, 494 F.3d at 630.

As we explained at length before, *Brady* and its progeny impose an obligation on state actors to disclose exculpatory evidence that is discovered before or during trial. See 494 F.3d at 627-30. This obligation does not cease to exist at the moment of conviction. Otherwise no one could argue a *Brady* point either on direct appeal or in a collateral attack under 28 U.S.C. § 2254 or § 2255.

Although the district court did not address any of the ISP defendants' other arguments in support of immunity, we can quickly dispose of them. First, they assert that plaintiffs cannot raise a *Brady* claim because, in the final analysis, they prevailed in their criminal proceeding. We have suggested, without squarely holding, that "a trial that results in an acquittal can never lead to a claim for a *Brady* violation because the trial produced a fair result, even without the exculpatory evidence." *Mosley v. City of Chicago*, 614 F.3d 391, 397 (7th Cir. 2010). But even if this is correct, it has nothing to do with Whitlock's and Steidl's cases. Both were *convicted* after trials that, years later, were acknowledged to have been riddled with constitutional violations. See *Illinois v. Whitlock*, No. 4-05-0958 (Ill. App. Ct. Sept. 6, 2007) ("The cumulative prejudicial effect of the ineffective assistance and the *Brady* violations requires a new trial. . . . Reinbolt's and Herrington's credibility was the *sine qua non* of the State's case."). The fact that Whitlock and Steidl were ultimately able to have their convictions set aside does not mean that they are "prevailing criminal defendants" in the sense that *Mosley* used the term. To hold otherwise would be a perverse application of that doctrine.

The ISP defendants also complain that their failure to reinvestigate the Rhodes homicides is not a due process violation. If this were the claim plaintiffs were making, the ISP defendants would be correct. There is no affirmative duty on police to investigate. See, *e.g., Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005); *Linda R.S. v. Richard D.,* 410 U.S. 614 (1973). But that is not Whitlock's theory. Whitlock asserts that the ISP defendants "took affirmative steps to quash an investigation to further conceal the evidence." That is quite different from a failure-to-investigate complaint.

B

The ISP defendants make a variety of additional arguments that boil down to an assertion that they are entitled to immunity because the undisputed evidence in the record demonstrates that they did not violate Whitlock's *Brady* rights. They urge that the case against them is only about the disclosure of a few memos that were turned over to Whitlock and various state prosecutors (at different points in time). That disclosure was all that was needed to comply with whatever obligation they had, in their view. For good measure, they add that the memos do not contain any exculpatory evidence that was unknown to Whitlock and that Whitlock has not shown that he was prejudiced by their failure to turn over the memos.

These arguments lie beyond the scope of this appeal. Whether the ISP defendants met their *Brady* obligations is an argument going to the merits. It may prove to be a

good defense, but it is "unrelated to immunity (a doctrine designed to protect public officials from the effects of guessing wrong in a world of legal uncertainty) and thus, *Johnson* held, not a proper ground of interlocutory appeal." *Anderson v. Cornejo*, 355 F.3d 1021, 1022 (7th Cir. 2004).

In any event, the record by no means compels the conclusion that these defendants discharged their *Brady* obligations. The ISP defendants focus on a few memos. But the case cannot be solely about these memos, because they were created after Whitlock's and Steidl's original trials. As we have stressed, the continuing *Brady* obligation that applies to the ISP defendants covers only evidence that existed at the time of the original trials. This does not foreclose Whitlock's suit, because we do not understand Whitlock's claim to be limited to these particular memos. The memos summarize some of the exculpatory evidence that was known to the ISP defendants at the time of trial. It is the underlying evidence, which the memos discuss, that is at issue. And even if the ISP defendants disclosed some or all of this evidence at a late date to Whitlock and the state prosecutors, Whitlock would still have a claim that their earlier nondisclosure was a *Brady* violation that caused him prejudice by delaying his ability to correct the taint on his original trial.

C

Finally, we address the ISP defendants' arguments that they are immune from suit on Whitlock's state law claims.

The parties dispute whether we have jurisdiction to consider this question, because Illinois courts do not provide for interlocutory appeals on the basis of immunity. Illinois's practice in this regard, however, does not control our jurisdiction. We have jurisdiction so long as Illinois's immunity is immunity from suit, rather than immunity from damages. See *Aspen Orthopedics & Sports Medicine LLC v. Aspen Valley Hosp. Dist.*, 353 F.3d 832 (10th Cir. 2003) ("Every circuit to address this issue . . . applies the same analysis . . . . [W]e have subject matter jurisdiction to hear appeals of orders denying motions to dismiss where the motions are based on immunity from suit. State law governs the scope of the immunity at issue."). The Illinois Supreme Court has not squarely addressed whether state law immunity is immunity from suit, rather than damages, but that court has implied that it is immunity from suit. See *Blair v. Walker*, 349 N.E.2d 385, 387 (Ill. 1976) (adopting official immunity because officials "should be able to carry out [their] daily responsibilities free from concern that [their actions] will result in civil damage suits").

The ISP defendants suggest that we certify this question to the Illinois Supreme Court, but we have no reason to bother that court because the question is not one that might be determinative. See ILL. S. CT. RULE 20(a). Here, even if the consequence of that court's decision were favorable to our jurisdiction, the defendants' argument would not succeed. Illinois law grants officials absolute immunity for torts arising out of the scope of their duties. *Harris v. News-Sun*, 646 N.E.2d 8, 11-12 (Ill. App. Ct. 1995). Absolute immunity can apply to similar torts, like those

at issue here. *Bays v. Edgar*, No. 87 C5045, 1998 WL 13639, *9 (N.D. Ill. Feb. 17, 1988). But the allegations brought against the ISP defendants are allegations that they took actions outside the scope of their duties: it is not within the scope of a police officer's duty to conceal exculpatory evidence. Thus, state law immunity would not apply.

The ISP defendants' argument that the state claims are barred on the ground of sovereign immunity fails for a similar reason. If the ISP defendants were being sued for acting in the scope of their duties, the claim could be construed as a suit against the State of Illinois rather than one against the ISP defendants as individuals. But Whitlock alleges that the ISP defendants violated his constitutional rights. "[W]hen an officer of the State commits an unconstitutional act or violates a statute, the suit is not against the State, because the State is presumed not to violate its own constitution or enactments." *Turpin v. Koropchak*, 567 F.3d 880, 884 (7th Cir. 2009). The ISP defendants cannot use the doctrine of sovereign immunity to avoid facing suit on Whitlock's state law claims.

* * *

We DISMISS the appeal for want of jurisdiction insofar as it pertains to the cases against police defendants Eckerty, Parrish, and Ray. Plaintiffs failed to take a cross-appeal challenging the district court's recognition of McFatridge's absolute immunity for the second stage of the proceedings, and so that issue is not properly before us. To the extent that McFatridge urges that he is entitled to absolute immunity for stage three, we

conclude that disputed issues of fact remain that preclude a definitive resolution. The same is true for his claim to absolute immunity during stage one. Insofar as he asserts an entitlement to qualified immunity for stages one and three, we AFFIRM the district court's rejection of that claim. Finally, we AFFIRM the district court's denial of qualified immunity for the ISP defendants.